IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SHARI S. WILCOXON             *
                              *
v.                            *    Civil Action No. WMN-12-978
                              *
DECO RECOVERY                 *
MANAGEMENT, LLC               *
                              *

*     *     *     *     *     *     *     *     *     *     *     *     *

**<u>MEMORANDUM</u>**

In this employment discrimination case, Plaintiff, Shari S.
Wilcoxon, seeks relief for an alleged retaliatory discharge in
violation of 42 U.S.C. § 2000e-3(a) (Title VII). Presently
pending before the Court is a motion for summary judgment filed
by Defendant, DECO Recovery Management, LLC (DECO), ECF No. 24.
The motion is fully briefed and ripe for review.[1]  The briefing,
facts, and applicable law lead the Court to two conclusions: (1)
DECO was probably a very challenging place to work, but (2)
nonetheless, Mrs. Wilcoxon has not produced sufficient evidence
to defeat DECO's motion.  DECO's motion for summary judgment
will, therefore, be granted.[2]

---

[1] The Court determines that no hearing is necessary. Local Rule
105.6.

[2] Two other matters in this case are before the Court.  First, is
a motion by DECO for sealing certain exhibits to its motion for
summary judgment, ECF No. 26.  DECO requests that the identified
exhibits be sealed in accordance with the parties Stipulated
Order Regarding Confidentiality of Discovery Materials, ECF No.
15.  Mrs. Wilcoxon supported DECO's request for sealing, ECF No.
29, having filed material subject to the confidentiality order

## I.    FACTUAL AND PROCEDURAL HISTORY

DECO was founded in 1994 by Jim Cooney and Gerald DeHanis. It operates to assist hospitals and health care providers to obtain reimbursement from uninsured patients.  Over the years, DECO's ownership team and employment rolls grew.  Many of the new additions were close friends or family members.  For example, Ted Cooney, Jim Cooney's son, joined the company in 1996 and became an equal co-owner with his father and DeHanis.

---

as an exhibit to her opposition.  Defendant's motion for sealing will be granted.

Second, is a request by Mrs. Wilcoxon to compel Tammy Marks to appear for and, more specifically, to answer certain questions at a deposition.  ECF No. 32.  Ms. Marks is a former employee of DECO who appeared at a deposition held on December 11, 2012, but who declined to answer a number of questions based on certain provisions of a settlement agreement she reached with DECO after her employment there ended.  The Court previously denied Mrs. Wilcoxon's request to compel Ms. Marks and required her to provide Ms. Marks with notice of her submission to the Court.  ECF No. 34.  Ms. Marks has since written to the Court outlining her position on this issue.  ECF No. 36.

Mrs. Wilcoxon's request to compel Ms. Marks' testimony despite her settlement agreement with DECO will be denied. Mrs. Wilcoxon argues that Ms. Marks' testimony "is crucial to Plaintiff's case," ECF No. 32 at 2, because Ms. Marks "has personal knowledge of her own improper termination, as well as general knowledge regarding DECO's sexist corporate culture, and its male-female disparities" and can assist Mrs. Wilcoxon in meeting her burden to show that her complaint was objectively reasonable.  Id.  The Court, however, fails to see how such testimony is, in any way, relevant to Mrs. Wilcoxon's claim of retaliation.  The record indicates that there is no dispute that Mrs. Wilcoxon's complaint about Ms. Meade's pay was a protected activity.  Furthermore, as discussed in this memorandum, the question of whether DECO's proffered business reasons for her dismissal are pretextual need not be reached because Mrs. Wilcoxon has failed to produce sufficient evidence from which a jury could find a prima facie case of retaliation.

James "Pete" Ash, who worked with DeHanis previously, joined the company in 2002.  Ash and DeHanis also served in the U.S. Navy together and maintained a close friendship – they were "best men" in each other's weddings.

Mrs. Wilcoxon was hired in 2004 as Vice President of Sales. According to Ted Cooney, the owners' goal at the time was "to grow this puppy up as quickly as we can without burying ourselves and put it on the market in 3 years or so."  Opp'n, Ex. 4 (Offer Letter) at 1.  To that end, increasing DECO's sales was Mrs. Wilcoxon's "top priority."  Id.; see also Opp'n, Ex. 2 (Wilcoxon Dep.) at 27 & 231-33.  In addition, Mrs. Wilcoxon was tasked with "polishing up [DECO's] collateral material, creating a 'report card' for our clients . . . and generally improving [the company's] responses to RFP's and market image."  Opp'n, Ex. 4 at 1; see also Opp'n, Ex. 2 at 27.  At the time she was hired, DECO's annual revenue was approximately $4 million and the company was servicing ten clients across the District of Columbia, Maryland, and Virginia.

The parties tell what appear to be very different stories about what happened after Mrs. Wilcoxon joined DECO, but the narratives may actually be two sides of the same coin.  DECO describes Mrs. Wilcoxon as a problem employee "from the very

beginning of her tenure." Def. Mem. at 5.[3]  It recites a litany

detailing DECO employees' complaints about her "antagonistic,"

"insulting," and "hostile communication style." Id. at 5-6.

DECO says that Mrs. Wilcoxon created substantial problems within

the company that caused other DECO employees to quit or threaten

to quit, and that every member of the DECO executive team

received complaints about Mrs. Wilcoxon's "abusive

communications." Id. at 6.

    In addition to her interpersonal difficulties, DECO

describes Mrs. Wilcoxon's failure to meet her goal of increasing

DECO's revenues to $20 million so that the company could be put

up for sale. Id. at 8-9.  Moreover, DECO notes its

dissatisfaction with the rapid increase in sales expenses

between 2004 and 2008. Id. at 9.  The owners, DECO says, "were

dissatisfied with Mrs. Wilcoxon's sales performance and wanted

to see immediate improvement." Id. at 9-10.

    DECO, of course, also describes how it "tried valiantly to

help [Mrs. Wilcoxon] be successful" id. at 10, and details its

efforts to coach Mrs. Wilcoxon to improve her communication

style and sales performance.  It points to portions of the

record indicating that she received "repeated requests" from the

---

[3] For ease of reference in illustrating the parties' competing
narratives of Mrs. Wilcoxon's time at DECO, the Court refers
here to the parties' memoranda.  Relevant citations to the
record are included in the Court's discussion section, Section
III, infra.

owners to improve her communication, all of which were "ignored." Id. at 7.  It discusses, at length, its decision to bring in multiple outside consultants to assess the sales team's performance, as well as to coach and counsel Mrs. Wilcoxon. Id. at 10-14.  As DECO presents it, the apparent conclusion of each of the consultants was the same – Mrs. Wilcoxon was the cause of what DECO perceived to be its lagging sales.  See, e.g., id. at 12 ("EntreQuest advised DECO that ... Ms. Wilcoxon was not a good fit for the VP of Sales & Marketing role and should be terminated.").  As a result, by February 2009, "DECO began to monitor the sales function more closely, including Ms. Wilcoxon's contributions and her management of the sales team." Id. at 14.

According to Mrs. Wilcoxon, it was she who was the victim of abuse.  Opp'n at 4 ("When Mrs. Wilcoxon came to work for DECO, she was quickly met with hostility from both Mr. DeHanis and Mr. Ash.").  And, because of the animosity she faced, she says she was forced to communicate with Ash "in writing in order to document his abusive conduct." Id.  In addition, Mrs. Wilcoxon describes the culture at DECO as being grossly sexist and misogynistic whereby certain owners and employees engaged in sexual affairs and misconduct with staff and clients that was "condoned by the other owners." Id. at 5.

Despite the allegedly challenging environment, Mrs.
Wilcoxon says that she was successful at increasing DECO's sales
from $4 million to $12 million.  Id. at 8-9.  Moreover, she
notes that the owners acknowledged her success by raising her
salary from $75,000 in 2004 to $128,000 in 2006, and by praising
her in emails.  Id. at 7-8.

The parties' stories do align in the spring of 2009.  That
March DECO implemented widespread salary cuts.  Mrs. Wilcoxon
herself received a $25,000 salary reduction.  She also learned,
however, that of the three people on her sales team, Jacki
Meade, the one female sales representative, was the only person
to receive a salary reduction.  Believing that Ms. Meade's pay
was cut because of her gender and was therefore discriminatory,
Mrs. Wilcoxon complained to DECO's Human Resources Director,
Jeanene Glover.  Mrs. Wilcoxon later raised her concern during a
meeting with the owners.  Following an investigation into Mrs.
Wilcoxon's complaint, DECO determined that Ms. Meade's pay
reduction was proper based on the respective pay arrangements of
the three members of the sales team, but that Ms. Meade was
still underpaid as compared to her male counterparts.  As a
result, DECO increased Ms. Meade's base salary to the same level
as Alan Cieslak, a male sales representative with similar prior
experience.

The stories diverge again regarding what transpired in the time period following Mrs. Wilcoxon's complaint. According to Mrs. Wilcoxon, she was immediately subject to retaliatory actions by the owners. Specifically, Mrs. Wilcoxon says she was no longer invited to participate in executive meetings, and that at a meeting with the sales team in July or August of 2009, Mr. DeHanis berated her in front of her team members and threatened her job. Opp'n at 11-12. DECO, on the other hand, makes no mention of excluding Mrs. Wilcoxon from executive meetings and says that Mr. DeHanis threatened the jobs of the entire sales team, not just Mrs. Wilcoxon's, at the summer meeting. Def. Mem. at 17-18. DECO also says that following the meeting with Mr. DeHanis, the sales team's performance continued to lag. Id. at 18.

Mrs. Wilcoxon's employment with DECO was terminated on October 13, 2009. She filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on January 20, 2010, alleging that she was terminated in retaliation for her complaint about Ms. Meade's salary reduction. The EEOC issued a right to sue letter on February 15, 2012, and Mrs. Wilcoxon filed this one-count complaint on March 29, 2012.

## II.  LEGAL STANDARD

Fed. R. Civ. P. 56 provides that summary judgment is appropriate if the moving party shows "that there is no genuine

dispute as to any material fact and that the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court's task is not to weigh the evidence, but to determine whether there is an issue appropriate for trial. Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

A dispute of fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In making this determination, all justifiable inferences from the evidence must be drawn in favor of the non-moving party. Id. at 255. The dispute, however, must also be over a material fact. That is, one that might affect the outcome of the suit under the controlling substantive law; "factual disputes that are irrelevant or unnecessary" will not be considered in ruling on a motion for summary judgment. Id.

"To be entitled to consideration on summary judgment, the facts set forth by the parties in affidavits or otherwise must be such as would be admissible in evidence." Miskin v. Baxter Healthcare Corp., 107 F. Supp. 2d 669, 671 (D. Md. 1999) aff'd, 213 F.3d 632 (4th Cir. 2000). Thus, a plaintiff seeking to defeat summary judgment must proffer "sufficient proof, in the form of admissible evidence, that could carry the burden of

8

proof in his claim at trial." Mitchell v. Data Gen. Corp., 12
F.3d 1310, 1315-16 (4th Cir. 1993).

## III. DISCUSSION

In a Title VII case such as this one, where DECO has
proffered a non-retaliatory reason for its conduct towards Mrs.
Wilcoxon, the Court's role is not to substitute its judgment for
that of DECO. DeJarnette v. Corning, Inc., 133 F.2d 293, 298-99
(4th Cir. 1998). Rather, at the summary judgment stage, the
Court's inquiry is limited to whether Mrs. Wilcoxon can proceed
by presenting either direct evidence of retaliation or indirect
evidence under the burden shifting scheme of McDonnell Douglas
Corporation v. Green, 411 U.S. 792 (1973). See Medlock v.
Rumsfeld, 336 F. Supp. 2d 452, 465-66 (D. Md. 2002). In neither
case has she met the burden required to survive summary
judgment.

### A.   Mrs. Wilcoxon Has Not Presented Any Direct Evidence of Retaliation

The Fourth Circuit has held that "direct evidence" is
"evidence that the employer 'announced, admitted, or otherwise
unmistakably indicated that [the forbidden consideration] was a
determining factor'" in the challenged conduct. Stover v.
Lincoln Pub., Inc., 73 F.3d 358 (4th Cir. 1995)(quoting Cline v.
Roadway Express, Inc., 689 F.2d 481, 485 (4th Cir. 1982)); see
also Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 520 (4th Cir.

2006).  "Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct."  Young-Losee v. Graphic Packaging Int'l, Inc., 631 F.3d 909, 912 (8th Cir. 2011)(citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57, 68 (2006)).

Mrs. Wilcoxon contends that her exclusion from executive meetings following her complaint, and Jim Cooney's statement at deposition, "people complaining," regarding some of the negative and nonproductive behavior in the office leading up to, and which resulted in her termination "is direct evidence that DECO retaliated against [her] for her protected disclosure."  Opp'n at 15.  It is not.  Neither Mrs. Wilcoxon's exclusion from meetings, nor Jim Cooney's statement is an announcement, an admission, or an otherwise unmistakable indication that Mrs. Wilcoxon's complaint was a motivating factor in DECO's treatment of her.[4]  Moreover, assuming – because Mrs. Wilcoxon does not

---

[4] Jim Cooney's comment, "people complaining," comes from a larger discussion of the reasons that Mrs. Wilcoxon was terminated:

Q.  So what happened between April and October that resulted in her termination?

A.  Well, the whole atmosphere, if that's the right word, of business growth that wasn't happening.  We

specify – that the adverse action complained of in this instance is her termination,[5] the evidence Mrs. Wilcoxon offers is insufficient to allow a reasonable trier of fact to find a link between her complaint and her termination.

> **B.  Mrs. Wilcoxon Cannot Proceed Under the Burden Shifting Scheme of McDonnell Douglas Because She Cannot Establish a Prima Facie Case of Retaliation**

---

> were getting more and more concerned.  It was still a tough year, even though we laid off people.  And, you know, we were trying to – we just were getting more and more anxious, and we weren't getting the growth we felt we should get.  There was a lot of negativity going on in the office.  It was a lot of – a lot of things happening that was just nonproductive.
>
> Q.  Like what?
>
> A.  People complaining.  People always trying to get people in trouble.  People trying to – you know, a lot of backstabbing.  And all of this stuff was going on. And I don't want to, you know, point any fingers, but Shari was very difficult to get along with in those times. I didn't have a problem because I wasn't interacting with her very much.  But people were having a difficult time.  And – and we had to talk to her any number of times about her attitude and about how she was handling people and what was going on. And it became – it became almost untenable.  It did become untenable.  And we – we- just decided that production wasn't there.  The negativity that was coming from her, and had been for a long time, that it just wasn't working.  And was time to make a change.

Jim Cooney Dep. at 42:20-44:4.

[5] In her argument under the burden shifting framework of McDonnell Douglas, infra, Mrs. Wilcoxon argues that her exclusion from executive meetings and being berated by Mr. DeHanis were adverse employment actions, in addition to her termination.

Under the burden shifting scheme of <u>McDonnell Douglas</u> a
plaintiff must first establish a prima facie case of retaliation
by a preponderance of the evidence.  <u>Laughlin v. Metro.</u>
<u>Washington Airports Auth.</u>, 149 F.3d 253, 258 (4th Cir. 1998).
Once the plaintiff establishes her prima facie case, there is a
presumption of retaliation and the burden shifts to the
defendant to articulate a non-retaliatory reason for its
conduct.  <u>Id.</u>  The defendant's burden at this stage is not to
persuade the trier of fact that its proffered reason was the
actual motivation for the challenged decision.  <u>Mereish v.</u>
<u>Walker</u>, 359 F.3d 330, 335 (4th Cir. 2004).  Rather, the
defendant "must merely articulate a justification that is
'legally sufficient to justify a judgment' in his favor."  <u>Id.</u>
(quoting <u>Texas Dept. of Cmty. Affiars v. Burdine</u>, 450 U.S. 248,
255 (1981)).  If the defendant meets its burden of production,
the presumption of retaliation is displaced and the plaintiff
must persuade the fact finder that the defendant's proffered
reason is merely a pretext for discrimination.  <u>Id.</u> at 334;
<u>E.E.O.C. v. Navy Fed. Credit Union</u>, 424 F.3d 397, 405 (4th Cir.
2005).

Mrs. Wilcoxon's claim fails because she has not produced
evidence from which a reasonable jury could find a prima facie
case of retaliation.  "To establish a prima facie case of
retaliation, a plaintiff must prove three elements: (1) that she

engaged in protected activity, (2) that an adverse employment action was taken against her, and (3) that there was a causal link between the protected activity and the adverse employment action." Laughlin, 149 F.3d at 258; Hopkins v. Balt. Gas & Elec. Co., 77 F.3d 745, 754 (4th Cir. 1996).  There is no dispute that Mrs. Wilcoxon's complaint about the disparity in Ms. Meade's pay was protected activity.  Rather, DECO challenges Mrs. Wilcoxon's ability to establish the latter two elements of her prima facie case.

As to the second element – an adverse employment action – there is also no dispute that Mrs. Wilcoxon's termination was an adverse employment action.  Def. Mem. at 21-22; Hartsell v. Duplex Prod., Inc., 123 F.3d 766, 775 (4th Cir. 1997); see generally Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).  DECO, however, challenges Mrs. Wilcoxon's assertion that her alleged exclusion from DECO's executive meetings and that the owners' alleged maltreatment of her, following her complaint, Opp'n at 18, are adverse employment actions.  Def. Mem. at 22-25.

Whether an employer's conduct constitutes an adverse employment action under Title VII's antiretaliation provision is measured by an objective standard.  White, 548 U.S. at 68. Specifically, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which

in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. (internal quotations omitted).  DECO argues that Mrs. Wilcoxon's exclusion from meetings does not meet this standard. It cites to Alexander v. Marriott International Inc., 2011 WL 1231029 at *9 (D. Md. Mar. 29, 2011), where the Court held that "[m]ere exclusion from meetings – absent any tangible, corresponding injury – is not conduct that would dissuade a reasonable worker from making or pursuing a charge of discrimination."  Just like the plaintiff in Alexander, Mrs. Wilcoxon has not alleged – let alone produced any evidence – that being excluded from the meetings resulted in any tangible injury to her.  Id.; Compl. ¶ 11.  Instead, similar to the plaintiff in Alexander, Mrs. Wilcoxon argues that she was harmed because she was unable "to participate in decisions regarding DECO's operations."  Alexander, 2011 WL 1231029 at *9; Opp'n at 18.  No reasonable jury could find that this is conduct that would dissuade a reasonable worker from making or supporting a charge of discrimination.

The same can be said for Mrs. Wilcoxon's assertion that "the Owners' treatment of [her] also dramatically changed after her complaint" and that she "was berated by Jerry DeHanis in front of her sales team."  Opp'n at 18.  First, neither of these supposed repercussions was alleged in her complaint.  Second,

14

the Supreme Court in White was clear that generally, "petty
slights, minor annoyances, and simple lack of good manners,"
which are not uncommonly found in the workplace, do not qualify
as materially adverse employment actions.  548 U.S. at 68.  Mrs.
Wilcoxon speaks of her embarrassment and discomfort at being
berated by DeHanis in front of her sales team, Opp'n at 18, but
this is not enough to elevate her maltreatment to the level of a
materially adverse employment action.  See Livingston v. Datex-
Ohmeda, Inc., Case. No. WDQ-05-3401, 2008 WL 7289608 at *3 (D.
Md. May 7, 2008) aff'd sub nom. Livingston v. Gen. Elec. Co.,
316 Fed App'x 233 (4th Cir. 2009).  Therefore, the only
materially adverse employment action Mrs. Wilcoxon suffered was
her termination in October 2009.

     The final element in a plaintiff's prima facie case is a
causal link between the protected activity and the materially
adverse employment action.  Mrs. Wilcoxon must show that she was
fired because of the complaint she made about Ms. Meade's pay.
Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d
653, 657 (4th Cir. 1998) ("the employer must have taken the
adverse employment action because the plaintiff engaged in a
protected activity") (emphasis in original).  The causal link
element can be satisfied when an employee is subjected to a
materially adverse employment action shortly after engaging in a
protected activity.  See e.g., Carter v. Ball, 33 F.3d 450, 460

(4th Cir. 1994).   The time between the two events, however, must be "very close."   Clark Cnty. School Dist. v. Breeden, 532 U.S. 268, 273 (2001)(citing Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (4-month period insufficient)).

Mrs. Wilcoxon argues that the decision to terminate her was made sometime in August 2009, roughly four months after her complaint, even though she was actually terminated in October 2009.   Opp'n at 19.   Mrs. Wilcoxon relies on the deposition testimony of Ted Cooney who assumed that the decision was made in "late summer."   Id.; T. Cooney Dep. 42:15-18 (Q  Can you tell me roughly when you [decided to let Mrs. Wilcoxon go?] A  Well, we let her go in October.  So I'm assuming that it was sometime in late summer.).   Whether the relevant date is August or October 2009 makes no difference.   In neither case is the temporal proximity, by itself, sufficient to establish a link between Mrs. Wilcoxon's complaint and her termination.   See Breeden, 532 U.S. at 273.

In cases such as this one, "where temporal proximity between a protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus."   Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir. 2007) (quoting Farrell v. Planters

Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000) (internal
quotation omitted)).  Mrs. Wilcoxon points to four pieces of
evidence which she says illustrate DECO's retaliatory animus:
(1) her exclusion from executive meetings, (2) Jim Cooney's
statement at deposition that she was fired because of "people
complaining," (3) her belief, based on her view of his face
after he received news of the complaint that Ted Cooney was not
happy, and his alleged subsequent decrease in interactions with
Mrs. Wilcoxon, and (4) her fear that she would be retaliated
against when she made her complaint.  Opp'n at 20-22.  For
various reasons, none of these are sufficient to indicate that
DECO harbored any retaliatory animus towards Mrs. Wilcoxon.

Mrs. Wilcoxon's belief that Ted Cooney was not happy after
he received news of her complaint and her fear of being
retaliated against are irrelevant to the question of whether
DECO in fact acted with retaliatory animus leading up to her
termination.  The remaining actions by DECO, even when all
justifiable inferences are drawn in Mrs. Wilcoxon's favor,[6] are
insufficient because it is undisputed that they did not have a
significant detrimental effect on Mrs. Wilcoxon's employment.
See James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th

---

[6] The Court concludes that Ted Cooney's statement at deposition
"people complaining," when considered in context, supra note 2,
does not support a reasonable inference that DECO acted with
retaliatory animus.

Cir. 2004); Cf. Lettieri v. Equant Inc., 478 F.3d at 650.  The

facts in Lettieri, which Mrs. Wilcoxon cites in support of her

claim, stand in sharp contrast to the facts of Mrs. Wilcoxon's

case.  There, the court described the sequence of events from

the plaintiff's complaint about gender discrimination through

her termination, as follows:

> Lettieri contacted Hausner in Human Resources on
> December 17, 2001, to report gender discrimination by
> Taylor and Parkinson. Over the next two days Hausner
> conveyed Lettieri's complaints to the two men. After
> Lettieri lodged her complaint, Taylor gave up on his
> plan to transfer her to New York. But the very next
> month (January 2002) Taylor stripped Lettieri of
> significant job responsibilities. He reduced her
> supervisory responsibilities over the sales team and
> took away her authority to set prices and meet
> directly with Sprint clients. These steps made it
> easier for Taylor to take the position later that
> Lettieri was not needed and should be terminated.
> Before long, in February or March 2002, Taylor and
> Parkinson began discussions about firing Lettieri.
> This was well before Equant asked managers such as
> Taylor to look for positions that could be eliminated.
> Right after Radochia took over Parkinson's role in
> April 2002, Taylor informed Radochia that he had "big
> issues with [Lettieri]" and that "her role [was] not
> really needed." J.A. 264. After the decision was made
> to terminate Lettieri in June of 2002 because her
> position was supposedly redundant, Taylor immediately
> sought approval to hire a replacement for Lettieri.

Lettieri, 478 F.3d at 650-51.  The facts in Lettieri suggest an

unequivocal and deliberate campaign by the plaintiff's

supervisors to make it difficult for the plaintiff to fulfill

her job responsibilities.  Mrs. Wilcoxon does not argue, and the

record does not support, that a similar campaign took place here; Mrs. Wilcoxon has not adduced evidence from which a jury could find a prima facie case of retaliation because there is nothing to suggest that she was terminated because of her complaint.  The Court, therefore, will enter summary judgment in DECO's favor.

**IV.   CONCLUSION**

For the foregoing reasons, DECO's Motion for Summary Judgment will be granted.  A separate order will issue.

_____ /s/ _____
William M. Nickerson
Senior United States District Judge

February 14, 2012